IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
MARY CAMPILII,                  *
                                *
           Plaintiff,           *
                                *
     v.                         *        CV 110-012
                                *
CHARLES RHODES, SR.,            *
and MARY RHODES,                *
                                *
           Defendants.          *
```

# O R D E R

Presently before the Court is Defendants' motion for summary judgment. (Doc. nos. 11 & 12.)[1] The Clerk gave Plaintiff appropriate notice of the motion and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 13.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

---

[1] While the docket shows two separate motions for summary judgment, these entries are duplicative.

## I. BACKGROUND

This case arises from the tragic death of Plaintiff Mary Campilii's five-year old son, J.C., who drowned in a pond on Defendants' property in Wilkes County, Georgia.[2] The underlying facts of this case are largely undisputed.

Defendants Charles Rhodes, Sr., and his wife, Mary Rhodes, ("Defendants") own rural property in Wilkes County, Georgia, that includes two ponds. (Doc. no. 11, Ex. 1 at 1; Doc. no. 21 at 1; C. Rhodes Dep. at 19-20.) Mr. Rhodes describes this property as a "hobby farm," upon which he maintains a personal garden and raises a small number of cattle. (C. Rhodes Dep. at 20-21.)

In 2007, Defendants agreed to allow Plaintiff Mary Campilii ("Plaintiff") to pasture two horses on their property for a fee of $150.00 per month.[3] (Id. at 22.) Pursuant to this oral agreement, Defendants allowed the horses to pasture on their land and eat hay with their cows during the winter months (id. at 22-23), and Plaintiff remained responsible for caring for the horses, including supplying them with feed as needed (Campilii Dep. at 29).

---

[2] Pursuant to Local Rule 8, minor children are only identified by their initials.

[3] In early 2007, Defendants agreed to pasture a single horse for $100.00 per month; Plaintiff later obtained a second horse in mid-2007 and Defendants agreed to also allow this horse to pasture on their land for an additional $50.00 per month. (C. Rhodes Dep. at 22.)

2

Plaintiff visited Defendants' farm daily to feed and otherwise care for her horses. (Id. at 30.) Plaintiff would often bring her son, J.C., along with her. (Id.) Occasionally, Plaintiff and her son would venture together to one of Defendants' two ponds and use a butterfly net to catch minnows and frogs.[4] (Id. at 32 & 54.) Neither Plaintiff nor her son ever swam in this pond, which was used solely for watering Defendants' livestock. (Id. at 35.)

Around dusk, on July 12, 2007, Plaintiff arrived at Defendants' farm to feed her horses. (Id. at 40-41; C. Rhodes Dep. at 29.) Plaintiff was accompanied by her son, J.C., Plaintiff's friend, Jennifer Slaton, and Ms. Slaton's two young children, H.S. and D.S., who were five and eight years old, respectively. (Campilii Dep. at 41-42.)

Soon after arriving at the farm, Plaintiff began feeding her horses and noticed that one appeared to be choking.[5] (Id. at 45-46.) As she tended to the horse, Plaintiff was aware that the children had exited her vehicle and were playing nearby.[6]

---

[4] When asked at her deposition which pond Plaintiff and her son would visit to catch minnows and frogs, Plaintiff responded that it was the same pond in which J.C. drowned. (Campilii Dep. at 54.)

[5] Plaintiff alleges that the horse was choking on corn stalks Mr. Rhodes threw from his garden into the pasture. (Campilii Dep. at 45.) Mr. Rhodes has acknowledged that he regularly feeds his cows corn stalks, which can, on occasion, get under the tongues of cows or horses. (C. Rhodes Dep. at 26.)

[6] According to Mr. Rhodes, who was working on his car nearby when Plaintiff and her guests arrived at the farm, H.S. and J.C. ran to the pond after Ms. Slaton and Plaintiff removed the feed bucket from the vehicle's trunk and left to feed the horses. (C. Rhodes Dep. at 24.)

3

(Id. at 50.) At some point, while dealing with the horse, Plaintiff recognized that D.S. was "pouting" by the pond, and Plaintiff and Ms. Slaton went to the nearby pond to investigate. (Id. at 51.)

Plaintiff asked D.S. what was wrong, and D.S. responded by informing Plaintiff that H.S., Ms. Slaton's daughter, had gone swimming. (Id.) Ms. Slaton quickly jumped into the water and pulled out H.S., who was barely managing to keep her head above water. (Id.) Plaintiff saw no sign of J.C. except for his butterfly net, which was in the water, near the pond's bank. (Id. at 54.) Upon questioning, Ms. Slaton's children proved unwilling or unable to disclose J.C.'s whereabouts. (Id. at 55-56.)

Plaintiff and Ms. Slaton then began frantically searching for J.C. (Id.) After several minutes passed with no success, Plaintiff ran to Defendants' home and called 911. (Id. at 57.) Soon after, emergency personnel, along with Mr. Rhodes,[7] arrived at the farm and began searching for the boy. (Id.) Within less than a minute, Mr. Rhodes emerged from the pond with J.C., at which time the emergency personnel attempted to resuscitate him and placed him in an ambulance. (Id. at 57-61.) J.C. was

---

[7] After briefly assisting Plaintiff with her horse, Mr. Rhodes went with his wife to the grocery store and, upon their return, learned that J.C. was missing, at which time he joined in the search. (C. Rhodes Dep. at 27-30.)

4

subsequently rushed to a hospital where his death was later pronounced. (<u>Id.</u> at 61.)

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," <u>United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's

5

case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence

6

that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

### III. DISCUSSION

Plaintiff brought this lawsuit against Defendants on January 22, 2010. Plaintiff alleges in her complaint that Defendants are jointly and severally liable for their negligence in failing to keep their property safe for business invitees; Plaintiff contends that Defendants' negligence ultimately resulted in the death of her child.

> The elements of a negligence cause of action are: (1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a causal connection between the conduct and the injury; and (4) damages from the breach of duty.

Lowry v. Cochran, 305 Ga. App. 240, 246 (2010) (citation omitted).

In a premises liability action, the duty owed by the landowner depends upon the legal status of the individual allegedly injured as a result of the landowner's negligence, in this case Plaintiff's son. See Tobar v. United States, 696 F. Supp. 2d 1373, 1378 (S.D. Ga. 2009) (applying Georgia law in premises liability case). Accordingly, an initial question arises here as to whether J.C. held the status of a licensee or invitee at the time of his death.

A licensee is defined in Georgia as any individual who "[d]oes not stand in any contractual relation with the owner of the premises" and who "is permitted, expressly or impliedly, to go on the premises merely for his own interests, convenience, or gratification." O.C.G.A. § 51-3-2. Customers, servants, and trespassers are expressly excluded from this definition under the Georgia Code. Id. An invitee, on the other hand, is a person who, "by express or implied invitation, has been induced or led to come upon premises for any lawful purpose." Jarrell v. JDC & Assocs., 296 Ga. App. 523, 524 (2009) (quoting Matlack v. Cobb Elec. Membership Corp., 289 Ga. App. 632, 658 (2008)).

The Court recognizes that this is a somewhat peculiar case because J.C.'s entire reason for being on the farm was due to his mother's business relationship with Defendants, yet J.C. had no such relationship with Defendants. This is not the first case, however, in which a court has been forced to decide

8

whether an injured child, accompanying an invitee parent, was a licensee or invitee. In E.R. Anderson v. Cooper, 214 Ga. 164 (1958), a parent brought an action on behalf of an infant child after the child was injured in a bakery that he was carried into by his father. The Georgia Supreme Court held that the determinative question as to the child's legal status was whether the owner or occupant of the premises received some benefit or had some interest in the purpose of the child's visit. Id. at 169. The court concluded that because the owner of the bakery "received a real benefit and had a real interest in permitting a child to accompany his father" into the bakery, the child was an invitee at the time he was injured. Id.

Here, like in Anderson, Defendants received a benefit and had an indirect financial interest in permitting J.C. to accompany his mother when she tended to her horses. Had Plaintiff, a single mother, not been allowed to bring her child along, presumably she would have been unwilling to pasture her horses on Defendants' property and Defendants would not have received the benefit of Plaintiff's monthly payment. Accordingly, the Court finds that J.C. was an invitee at the time he drowned.[8]

---

[8] The Court recognizes that the facts in this case are not identical to those set forth in Anderson. The line between licensee and invitee is more difficult to discern in this case. Here, Defendants were not operating a traditional business establishment in which customers come and go daily (i.e., a bakery), and clearly Defendants' relationship with Plaintiff went

9

An owner or occupier of land is liable in damages to "such persons for injuries caused by [their] failure to exercise ordinary care in keeping the premises and approaches safe." O.C.G.A. § 51-3-1. In the case of an invitee, a proprietor is required

> to discover and either keep the premises safe from or warn of hidden dangers or defects not observable to such invitees in the exercise of ordinary care. However, there is no duty to warn against obvious or patent dangers which may be observed and avoided by the exercise of ordinary care. . . . The basis of the proprietor's liability is his superior knowledge, and if his invitee knows of the condition or hazard, there is no duty on the part of the proprietor to warn the invitee and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does.

Barnes v. Morgantown Baptist Ass'n, Inc., -- Ga. App. ---, No. A10A1092, 2010 WL 4484615, at *2 (Nov. 10, 2010) (citations omitted).

Georgia courts have consistently held "that lakes, ponds, and similar bodies of water, either natural or manmade, are open and obvious hazards, *even to small children*." Brazier v. Phoenix Grp. Mgmt., 280 Ga. App. 67, 71 (2006) (emphasis added);

---

beyond their specific business transactions. (See Campilii Dep. at 35 ("[J.C. and I] always went swimming. [Defendants] let us use their pool at their house."); see also Doc. no. 12, Ex. 2 at 12 ("[O]f all the humans walking on earth, I can't name one (except my mother) I have more respect for than [Mr. Rhodes].").) In any event, even if J.C. held the status of licensee at the time of his death, Defendants would still be entitled to summary judgment in light of the fact that there is no evidence in the record of any willful or wanton conduct on the part of Defendants. See Wren v. Harrison, 165 Ga. App. 847, 848 (1983) ("A licensee cannot recover by showing that the defendant was merely negligent, but must show that the defendant willfully and wantonly injured him." (citations omitted)).

10

see also Bowers v. Grizzle, 214 Ga. App. 718, 720 (1994) (finding as a matter of law that a thirty-two month old child had natural fear of water); Coates v. Mulji Motor Inn, Inc., 178 Ga. App. 208, 213 (1986) (Deen, J., dissenting) ("[T]his court has always held, as a matter of law . . . that even a small child appreciates the dangers of natural bodies of water; surely some child has ventured into a natural body of water completely unaware of the risks, and drowned, but this court's adherence to the above principle has been steadfast."); McCall v. McCallie, 48 Ga. App. 99 (1933) ("The danger from fire and water is one that even young children may be said to apprehend."). Thus, a lake or pond is not considered a "mantrap" or "attractive nuisance" under Georgia law, Brazier, 280 Ga. App. at 71, and an owner of land containing a pond is generally "under no obligation to erect barriers or take other precautions to prevent [children] from being injured thereby." McCall, 48 Ga. App. at 99-100. Furthermore, whether a child is considered a licensee or an invitee, "[w]here parents are watching their child play on someone else's land and the parents are aware of a dangerous condition, it is the parents' duty, not that of the landowner, to ensure that the child avoids the danger." Scoggins v. Brown, 215 Ga. App. 601, 602 (1994).

In this case, the undisputed evidence shows that J.C. was purposely raised by his mother to develop a healthy fear of

11

water and he regularly went swimming, although he was only able to do so with the assistance of a life-jacket. (Campilii Dep. at 33-35.) There is no evidence in the record giving the Court any reason to suspect that either J.C. or his mother did not appreciate the pond's inherent dangers nor is there any evidence indicating that Defendants had a duty to warn J.C. or his mother about the pond.[9] Further, the undisputed evidence shows that J.C. and his mother were familiar with this particular pond, and, on occasion, would visit it to go fishing or to catch frogs and minnows. (Id. at 51 & 54.)

Because the evidence indisputably shows that both J.C. and his mother were subjectively aware of the pond and the dangers it posed, and because the invitee in this case is deemed, as a matter of law, to have been aware of the danger that resulted in his injury, the Court finds that there was no duty on the part of Defendants to warn J.C., and Defendants should not be held liable for J.C.'s injuries. Moreover, Plaintiff does not dispute that she was watching over J.C. at the time of his death and, thus, Plaintiff, not Defendants, had the duty to see to it that J.C. avoid any dangerous condition of which she was aware. See Scoggins, 215 Ga. App. at 602.

---

[9] Plaintiff has not identified any dangers posed by the pond beyond those inherent in any small body of water.

## IV. CONCLUSION

Based upon the foregoing, Defendants' motion for summary judgment (doc. nos. 11 & 12) is **GRANTED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this 20th day of December, 2010.

*[signature]*
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA